Joseph Eugene **DODSON**, a minor, by his next friend Gene **DODSON**, Plaintiff/Appellee,

v.

Burns **SHRADER**, Jr., and Mary Shrader, individually and d/b/a Shrader's Auto Sales, Defendant/Appellant.

Supreme Court of Tennessee, at Nashville.

Jan. 27, 1992.

William S. Fleming, Fleming, Holloway & Flynn, Columbia, for defendant/appellant.

Barbara J. Walker, Columbia, for plaintiff/appellee.

## OPINION

O'BRIEN, Justice.

This is an action to disaffirm the contract of a minor for the purchase of a pick-up truck and for a refund of the purchase price. The issue is whether the minor is entitled to a full refund of the money he paid or whether the seller is entitled to a setoff for the decrease in value of the pick-up truck while it was in the possession of the minor.

In early April of 1987, Joseph Eugene Dodson, then 16 years of age, purchased a used 1984 pick-up truck from Burns and Mary Shrader. The Shraders owned and operated Shrader's Auto Sales in Columbia, Tennessee. Dodson paid $4,900 in cash for the truck, using money he borrowed from his girlfriend's grandmother. At the time of the purchase there was no inquiry by the Shraders, and no misrepresentation by Mr. Dodson, concerning his minority. However, Mr. Shrader did testify that at the time he believed Mr. Dodson to be 18 or 19 years of age.

In December 1987, nine (9) months after the date of purchase, the truck began to develop mechanical problems. A mechanic diagnosed the problem as a burnt valve, but could not be certain without inspecting the valves inside the engine. Mr. Dodson did not want, or did not have the money, to effect these repairs. He continued to drive the truck despite the mechanical problems. One month later, in January, the truck's engine "blew up" and the truck became inoperable.

Mr. Dodson parked the vehicle in the front yard at his parents home where he lived. He contacted the Shraders to rescind the purchase of the truck and requested a full refund. The Shraders refused to accept the tender of the truck or to give Mr. Dodson the refund requested.

Mr. Dodson then filed an action in general sessions court seeking to rescind the contract and recover the amount paid for the truck. The general sessions court dismissed the warrant and Mr. Dodson perfected a *de novo* appeal to the circuit court. At the time the appeal was filed in the circuit court Mr. Shrader, through counsel, declined to accept the tender of the truck without compensation for its depreciation. Before the circuit court could hear the case, the truck, while parked in Dodson's front yard, was struck on the left front fender by a hit-and-run driver. At the time of the circuit court trial, according to Shrader, the truck was worth only $500 due to the damage to the engine and the left front fender.

The case was heard in the circuit court in November 1988. The trial judge, based on previous common-law decisions and, under the doctrine of stare decisis reluctantly granted the rescission. The Shraders were ordered, upon tender and delivery of the truck, to reimburse the $4,900 purchase price to Mr. Dodson. The Shraders appealed.

The Court of Appeals, per Todd, J., affirmed; Cantrell, J., concurring separately, Koch, J., dissenting.

The earliest recorded case in this State, on the issue involved, appears to be in *Wheaton v. East*, 13 Tenn. 35 (5 Yeager 41) (1833). In pronouncing the rule to apply governing infant's contracts, the court said:

> We do not perceive that any general rule, as to contracts which are void and voidable, can be stated with more precision that is done by Lord Ch.J.Eyre in *Keane v. Boycott*, 2 H.Black, 511, and quoted with approbation by Judge Story, 1 Mason's Rep. 82, and by Chancellor Kent, 2 Com. 193, which is this: "that when the court can pronounce the contract to be to the infant's prejudice, it is void, and when to his benefit, as for necessaries, it is good; and when the contract is of any uncertain nature, as to benefit or preju-

dice, it is voidable only, at the election of the infant." ...

The law on the subject of the protection of infant's rights has been slow to evolve. However, in *Human v. Hartsell*, 24 Tenn. App. 678, 148 S.W.2d 634, 636 (1940) the Court of Appeals noted:

The last case in Tennessee holding a minor's contract void and adopting as the criterion for determining whether a given contract is void or only voidable [based upon] the prejudicial, uncertain or beneficial effect upon the rights and interests of the minor, appears to be the case of *Robinson v. Coulter*, supra, [90 Tenn. 705, 18 S.W. 250] decided November 12, 1891. In *Tuck v. Payne*, 159 Tenn. 192, 17 S.W.2d 8, in an opinion by Mr. Justice McKinney, the modern rule that contracts of infants are not void but only voidable and subject to be disaffirmed by the minor either before or after attaining majority appears to have been favored.

Under this rule the efforts of early authorities to classify contracts as beneficial or harmful and determine whether they are void or only voidable upon the basis of such classification are abandoned in favor of permitting the infant himself when he has become of age to determine what contracts are and what are not to his interest and liking. He is thus permitted to assume the burden of a contract, clearly disadvantageous to him, if he deems himself under a moral obligation to do so.

The adoption of this rule does not lead to any retrenchment of the infant's rights but gives him the option of invoking contracts found to be advantageous but which, if held void, could not be enforced against the other party to the contract. Thus the minor can secure the advantage of contracts advantageous to himself and be relieved of the effect of an injudicious contract.

In *Tuck*, supra, 17 S.W.2d at p. 9, the court applied the rule based upon the maxims that he who seeks equity must do equity, that he who comes into equity must come with clean hands, that no one can take advantage of his own wrong, that he that has committed inequity shall not have equity, and that minors will not be permitted to use the shield of infancy as a cover, or turn it into a sword with which to injure others dealing with them in good faith.

As noted by the Court of Appeals, the rule in Tennessee, as modified, is in accord with the majority rule on the issue among our sister states. This rule is based upon the underlying purpose of the "infancy doctrine" which is to protect minors from their lack of judgment and "from squandering their wealth through improvident contracts with crafty adults who would take advantage of them in the marketplace." *Halbman v. Lemke*, 99 Wis.2d 241, 245, 298 N.W.2d 562, 564 (1980).

There is, however, a modern trend among the states, either by judicial action or by statute, in the approach to the problem of balancing the rights of minors against those of innocent merchants. As a result, two (2) minority rules have developed which allow the other party to a contract with a minor to refund less than the full consideration paid in the event of rescission.

The first of these minority rules is called the "Benefit Rule." *E.g., Hall v. Butterfield*, 59 N.H. 354 (1879); *Johnson v. Northwestern Mut. Life Insurance Co.*, 56 Minn. 365, 59 N.W. 992 (1894); *Berglund v. American Multigraph Sales Co.*, 135 Minn. 67, 160 N.W. 191 (1916); *Porter v. Wilson*, 106 N.H. 270, 209 A.2d 730 (1965); *Valencia v. White*, 134 Ariz. 139, 654 P.2d 287 (Ariz.App.1982). The rule holds that, upon rescission, recovery of the full purchase price is subject to a deduction for the minor's use of the merchandise. This rule recognizes that the traditional rule in regard to necessaries has been extended so far as to hold an infant bound by his contracts, where he failed to restore what he has received under them to the extent of the benefit actually derived by him from what he has received from the other party to the transaction. *See Porter v. Wilson*, 106 N.H. 270, 209 A.2d 730, 13 A.L.R.3d 1247 (1965); *Valencia v. White*, supra, 2 Williston on Contracts, § 238, p. 43 (3rd Ed.

Jaeger 1959). *Berglund v. American Multigraph Sales Co.*, supra.

The other minority rule holds that the minor's recovery of the full purchase price is subject to a deduction for the minor's "use" of the consideration he or she received under the contract, or for the "depreciation" or "deterioration" of the consideration in his or her possession. *See Carter v. Jays Motors*, 3 N.J.Super. 82, 65 A.2d 628 (N.J.S.Ct., App.Div.1949); *Creer v. Active Automobile Exch.*, 99 Conn. 266, 121 A. 888 (Conn.1923); *Rodriguez v. Northern Auto Auction*, 225 N.Y.S.2d 107 (N.Y.App.Div.1962); *Pettit v. Liston*, 97 Or. 464, 191 P. 660 (1920).

We are impressed by the statement made by the Arizona Appeals Court in *Valencia v. White*, supra, citing the Court of Appeals of Ohio in *Haydocy Pontiac Inc. v. Lee*, 19 Ohio App.2d 217, 250 N.E.2d 898 (1969):

> At a time when we see young persons between 18 and 21 years of age demanding and assuming more responsibilities in their daily lives; when we see such persons emancipated, married, and raising families; when we see such persons charged with the responsibility for committing crimes; when we see such persons being sued in tort claims for acts of negligence; when we see such persons subject to military service; when we see such persons engaged in business and acting in almost all other respects as an adult, it seems timely to re-examine the case law pertaining to contractual rights and responsibilities of infants to see if the law as pronounced and applied by the courts should be redefined.

In *Pettit v. Liston*, supra, the Oregon court, endeavoring to resolve issues similar to those at hand in this case noted that in dealing with the right of the minor to rescind his contract and the conditions under which he may do so, the decisions of the courts in the different states have not only conflicted upon the main question involved, but many of the decisions of the same court in the same state seem to be inconsistent with each other; and often times one court has made its decision turn upon a distinction or difference not recognized by the courts of other states as a distinguishing feature. As a result rules have been promulgated which are considered to be suitable and appropriate upon considerations of principal and public policy.

Upon serious reflection we are convinced that a modified form of the Oregon rule should be adopted in this State concerning the rights and responsibilities of minors in their business dealings.

This is no quantum leap in the evolution of the common law. As early as 1842, in the case of *Jacob v. The State*, 22 Tenn. 372, 388, 3 Humphreys 514 (1842), Justice Turley delivered a profound dissertation on the policy and principles of the common law:

> The common law has been aptly called the *"lex non scripta,"* because it is a rule prescribed by the common consent and agreement of the community as one applicable to its different relations, and capable of preserving the peace, good order, and harmony of society, and rendering unto every one that which of right belongs to him. Its sources are to be found in the usages, habits, manners, and customs of a people. Its seat is in the breast of the judges who are its expositors and expounders. Every nation must of necessity have its common law, let it be called by what name it may, and it will be simple or complicated in its details, as society is simple or complicated in its relations. A few plain and practical rules will do for a wandering horde of savages, but they must and will be much more extensively ramified when civilization has polished, and commerce and arts and agriculture enriched, a nation. The common law of a country will, therefore, never be entirely stationary, but will be modified, and extended by analogy, construction and custom, so as to embrace new relations, springing up from time to time, from an amelioration or change of society. The present common law of England is as dissimilar from that of Edward III. as is the present state of society. And we apprehend that no one could be found to contend that

hundreds of principles, which have in more modern times been examined, argued, and determined by the judges, are not principles of the common law, because not found in the books of that period. They are held to be great and immutable principles, which have slumbered in their repositories, because the occasion called for their exposition had not arisen. The common law, then, is not like the statute law, fixed, and immutable but by positive enactment, except where a principle has been adjudged as the rule of action.

If, then, one generation be not so hedged in by the principles of the common law, established by another, as to be prohibited from extending them, by analogy and construction, to new relations and modifications of society, by what principle shall a sovereign state, which has adopted the common law of another as one of its rule of action, be so prohibited?

Such, then, is the common law, that though principles once established by judicial determination can only be changed by legislative enactment, yet such is its malleability (if we may use the expression) that new principles may be developed, and old ones extended, by analogy, so as to embrace newly-created relations and changes produced by time and circumstances....

The late Justice Joseph W. Henry, past member and former Chief Justice of this Court stated the message of the flexibility of the common law in more modern language in *Dunn v. Palermo*, 522 S.W.2d 679, 688 (Tenn.1975), as follows:

This Court in the past has not hesitated to depart from the rigid common law where "the reason for the common law rule does not exist." *Brown v. Shelby*, 206 Tenn. 71, 332 S.W.2d 166 (1960).

The common law does not have the force of Holy Writ; it is not a last will and testament, nor is it a cadaver embalmed in perpetuity, nor is it to be treated like the sin of Judah—"written with a pen of iron and with the point of a diamond." Jeremiah 17:1.

Former Chief Justice Frantz of Colorado, in his dissenting opinion in *Tesone v. School Dist. No. Re-2, In County of Boulder*, 152 Colo. 596, 384 P.2d 82 (1963), made this erudite observation on the common law:

"The common law of America is evolutionary; it is not static and immutable. It is in constant growth, going through mutations in adapting itself to changing conditions and in improving and refining doctrine. By its very nature, it seeks perfection in the achievement of justice."

This is an eloquent description of the greatness and the glory of the common law.

■ We state the rule to be followed hereafter, in reference to a contract of a minor, to be where the minor has not been overreached in any way, and there has been no undue influence, and the contract is a fair and reasonable one, and the minor has actually paid money on the purchase price, and taken and used the article purchased, that he ought not to be permitted to recover the amount actually paid, without allowing the vender of the goods reasonable compensation for the use of, depreciation, and willful or negligent damage to the article purchased, while in his hands. If there has been any fraud or imposition on the part of the seller or if the contract is unfair, or any unfair advantage has been taken of the minor inducing him to make the purchase, then the rule does not apply. Whether there has been such an overreaching on the part of the seller, and the fair market value of the property returned, would always, in any case, be a question for the trier of fact. This rule will fully and fairly protect the minor against injustice or imposition, and at the same time it will be fair to a business person who has dealt with such minor in good faith.

This rule is best adapted to modern conditions under which minors are permitted to, and do in fact, transact a great deal of business for themselves, long before they have reached the age of legal majority. Many young people work and earn money and collect it and spend it oftentimes with-

out any oversight or restriction. The law does not question their right to buy if they have the money to pay for their purchases. It seems intolerably burdensome for everyone concerned if merchants and business people cannot deal with them safely, in a fair and reasonable way. Further, it does not appear consistent with practice of proper moral influence upon young people, tend to encourage honesty and integrity, or lead them to a good and useful business future, if they are taught that they can make purchases with their own money, for their own benefit, and after paying for them, and using them until they are worn out and destroyed, go back and compel the vendor to return to them what they have paid upon the purchase price. Such a doctrine can only lead to the corruption of principles and encourage young people in habits of trickery and dishonesty.

In view of the foregoing considerations, we conclude that the rule, as we have indicated, and which we have paraphrased from that adopted in the State of Oregon, will henceforth be the rule to be utilized in this State.

▮▮▮▮ We note that in this case, some nine (9) months after the date of purchase, the truck purchased by the plaintiff began to develop mechanical problems. Plaintiff was informed of the probable nature of the difficulty which apparently involved internal problems in the engine. He continued to drive the vehicle until the engine "blew up" and the truck became inoperable. Whether or not this involved gross negligence or intentional conduct on his part is a matter for determination at the trial level. It is not possible to determine from this record whether a counterclaim for tortious damage to the vehicle was asserted. After the first tender of the vehicle was made by plaintiff, and refused by the defendant, the truck was damaged by a hit-and-run driver while parked on plaintiff's property.. The amount of that damage and the liability for that amount between the purchaser and the vendor, as well as the fair market value of the vehicle at the time of tender, is also an issue for the trier of fact.

The case is remanded to the trial court for further proceedings in accordance with this judgment. The costs on appellate review are assessed equally between the parties.

REID, C.J. and DROWOTA, DAUGHTREY and ANDERSON, JJ., concur.